IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JENNIFER CASE, *et al.*,          )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )          CASE NO. 2:20-CV-777-WKW
                                  )                  [WO]
KAY IVEY, in her individual       )
capacity and official capacity as )
Governor of Alabama, *et al.*,    )
                                  )
            Defendants.           )

## MEMORANDUM AND OPINION ORDER

### I. INTRODUCTION

More than a year ago, on January 21, 2020, the first case of the Novel Coronavirus ("COVID-19") was confirmed in the United States. *See First Travel-related Case of 2019 Novel Coronavirus Detected in United States*, CDC NEWSROOM, cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html (last visited May 19, 2021). Since that time, COVID-19 has rapidly spread throughout the country, infecting at least 33,079,543 individuals, and it is listed as a cause of death in 591,265 deaths. *See COVID Data Tracker*, covid.cdc.gov/covid-data-tracker/#cases_totalcases (last visited June 1, 2021). The State of Alabama, like the rest of the country, has not been spared from the devastating effects brought on by the virus. To date, Alabama has confirmed 543,405 cases of COVID-19 and

11,146 Covid-related deaths.  *See Coronavirus Resource Center*, JOHNS HOPKINS UNIVERSITY & MEDICINE, coronavirus.jhu.edu/region/us/alabama (last visited June 1, 2021).

This case centers on certain proclamations and orders issued by the Governor of Alabama, Kay Ivey, and State Health Officer, Dr. Scott Harris (collectively "Defendants"), to stem the tide of the COVID-19 pandemic in Alabama.  Plaintiffs Jennifer Case, Rebecca Callahan, Pastor Mark Liddle, Pastor Jim Nelson, Dr. R.S. Porter, Scott Farr, and Bruce Ervin (collectively "Plaintiffs") filed suit against Defendants to challenge these proclamations and orders.  Before the court are Defendants' Motion to Dismiss (Doc. # 42), and Plaintiffs' Motion for Preliminary Injunction (Doc. # 2).  For the reasons stated below, Defendants' Motion to Dismiss is due to be granted, and Plaintiffs' Motion for Preliminary Injunction is due to be denied as moot.

## II.  JURISDICTION AND VENUE

The court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343.  The parties do not dispute personal jurisdiction or venue.

## III.  STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

2

U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that [the] defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "For purposes of Rule 12(b)(6) review, . . . a court generally may not look beyond the pleadings." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015).

Defendants challenge the court's subject matter jurisdiction by arguing that Plaintiffs lack standing to challenge the expired, rescinded, or otherwise terminated provisions from past COVID-19 orders.  An attack on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) may be either a facial attack or a factual attack. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam).  A facial attack simply challenges the sufficiency of the plaintiff's jurisdictional allegations, which are taken as true. *Id.* at 1529.  Factual attacks challenge "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).  All questions regarding Plaintiffs' standing can be resolved on the face of the complaint.

# IV.  BACKGROUND

On March 13, 2020, the President of the United States declared COVID-19 a national emergency.  That same day, Governor Ivey issued her own proclamation declaring that a state public health emergency existed in Alabama due to the presence of COVID-19.  (Doc. # 40-1.)  Following Governor Ivey's initial declaration, Defendants issued a string of proclamations and orders that imposed various restrictions and offered nonbinding guidelines to combat the spread of the virus.  Due to the fluidity of the pandemic, and as more information about COVID-19 came to light, the substance of Defendants' proclamations and orders evolved with the passage of time.  Given the nature of this case and the number of proclamations and orders at issue, it is necessary to discuss the authority under which Defendants acted and to detail the substance of their proclamations and orders.

## A.  **Defendants' authority to issue proclamations and orders related to COVID-19**

Beginning with Governor Ivey's authority, the Alabama Emergency Management Act ("AEMA") vests her with certain powers to respond to emergency situations like the COVID-19 pandemic.  *See* Ala. Code § 31-9-1 *et seq*.  The AEMA defines a state public health emergency as "[a]n occurrence or imminent threat of an illness that . . . [i]s believed to be caused by . . . [t]he appearance of a novel . . . infectious agent" and "[p]oses a high probability of" death or serious disability.  § 31-9-3(4)(a)-(b).  Amidst a state public health emergency, "the Governor is

4

authorized and empowered . . . [t]o make, amend, and rescind the necessary orders, rules, and regulations to carry out the provisions" of the AEMA.  § 31-9-6(1).  The statute also provides that "the Governor shall have and may exercise" emergency powers "[t]o enforce all laws, rules, and regulations relating to emergency management"; "[t]o perform and exercise such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population"; and "[t]o employ such measures . . . as may be reasonably necessary for the purpose of securing compliance with the provisions of [the AEMA] or with the findings or recommendations of such boards of health by reasons of conditions arising" from the emergency at hand.  § 31-9-8(a)(1), (5), (6).  Governor Ivey's proclamations issued in response to the COVID-19 pandemic squarely fall within the framework of the AEMA.

For his part, Dr. Harris, as the State Health Officer of Alabama, "shall . . . keep himself informed in regard to all diseases which may be in danger of invading the state and, as far as authorized by law, take prompt measures to prevent such invasions . . . ."  Ala. Code § 22-2-8.  Dr. Harris also possesses the authority to "adopt and promulgate rules and regulations providing proper methods and details for administering the health and quarantine laws of the state . . . ."  § 22-2-2(6).  These "rules and regulations shall have the force of law and shall be executed by the same courts, bodies, officials, agents, and employees as in the case of health laws

. . . ." *Id*.  The authority outlined above demonstrates that Alabama law provides Dr. Harris with the ability to issue orders in response to COVID-19.

It is also worth noting a broader principle at play in this case—Defendants' authority to enact policies (like the ones challenged here) in the face of an emergency is derived from the state's "police power."  *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals . . . ."); *see also State Police Power*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining state police power as "the power of a state to enforce laws for the health, welfare, morals, and safety of its citizens, if enacted so that the means are reasonably calculated to protect those legitimate state interests.").

**B.  Substance of Defendants' orders and proclamations**

The Governor's first declaration, on March 13, 2020, noted the presence of COVID-19 in Alabama and that the virus's appearance "in the State indicat[ed] the potential of widespread exposure to an infectious agent that pose[d] significant risk of substantial harm to a large number of people."  (Doc. # 40-1, at 1.)  Four days later, on March 17, 2020, Dr. Harris issued an order titled "Order of the State Health Officer Suspending Certain Public Gatherings Due to the Risk of Infection by COVID-19."  (Doc. # 40-1, at 4.)  Dr. Harris's order established that "the State Board of Health ha[d] designated COVID-19 to be a disease of epidemic potential, a threat

to the health and welfare of the public, or otherwise of public importance." (Doc. # 40-1, at 4.)  Moreover, the order implemented a ban on "all gatherings of 25 persons or more, or gatherings of any size that [could not] maintain a consistent six-foot distance between persons" in Blount, Saint Clair, Shelby, Tuscaloosa, and Walker counties.  (Doc. # 40-1, at 4.)  The restriction applied "to all gatherings, events, or activities that [brought] 25 or more persons in a single room or a single space at the same time."  (Doc. # 40-1, at 4.)

On March 18, 2020, Governor Ivey issued a supplemental declaration proclaiming "the existence of conditions that warrant[ed] implementation of additional extraordinary measures and relief during the state health emergency now in effect in order to guard public health and protect human life."  (Doc. # 40-1, at 7.)  The declaration, among other things, rescheduled the primary runoff election and required the closure of all K-12 public schools until April 6, 2020.  (Doc. # 40-1, 7–8.)[1]  The next day, Dr. Harris issued an order, applicable statewide, that reiterated the ban on gatherings of twenty-five persons or more, closed beaches, and imposed certain restrictions on senior citizen centers, hospitals, nursing homes, long term care facilities, bars, restaurants, and breweries.  (Doc. # 40-1, at 10–12.)  Dr. Harris issued

---

[1] This proclamation came on the heels of the national "15 Days to Slow the Spread" campaign, which encouraged individuals to heed the directions of state and local authorities and to adopt social-distancing measures like avoiding gatherings of more than ten people.  *See The President's Coronavirus Guidelines for America*, justice.gov/doj/page/file/1258511/download (last visited June 1, 2021).

7

another order on March 20, 2020, clarifying that the ban on gatherings of twenty-five persons or more applied to "all non-work related gatherings" and instructed that employers "shall take all reasonable steps" to comply with the restriction for employees and customers.  (Doc. # 40-1, at 15.)

On March 27, 2020, Dr. Harris issued an amended order with increased restrictions.  That order banned "all non-work related gatherings of 10 persons or more, or non-work related gatherings of any size that [could] not maintain a consistent six-foot distance between persons . . . ."  (Doc. # 40-1, at 18–19.)  The order also closed certain "non-essential" businesses and venues and prohibited various sports and fitness activities from taking place.  As relevant to the instant case, the March 27, 2020 order closed "close-contact service providers," such as barber shops.  (Doc. # 40-1, at 19.)

Then, on April 3, 2020, Dr. Harris issued a statewide "Stay at Home" order. (Doc. # 40-2, at 1–8.)  The Stay at Home order instructed individuals "to stay at his or her place of residence except as necessary to perform" certain "essential activities" like obtaining necessary supplies, obtaining or providing necessary services, attending religious services, taking care of others, attending work, engaging in outdoor activities, seeking shelter, traveling as required by law, and visiting family members.  Regarding the exception for attending religious services, the Stay at Home order specified that "[a] person may leave his or her place of residence to

attend an event that is a religious service, wedding, or funeral" provided that "the event involve[d] fewer than 10 people and the people maintain[ed] a consistent six-foot distance from one another" or if the event was a "drive-in"[2] worship service. (Doc. # 40-2, at 2–3.)   Additionally, the Stay at Home order defined "[r]eligious entities, including religious and faith-based facilities, entities and groups" as "essential businesses and operations."  (Doc. # 40-2, at 4, 6.)

Later in month, on April 28, 2020, Dr. Harris issued an amended order titled "Safer at Home" (Doc. # 40-8), which began easing certain restrictions imposed by the Stay at Home order.  For instance, the Safer at Home order no longer instructed individuals to stay at their residence except to perform essential activities.  Instead, the order reinstituted the ban on "all non-work related gatherings of 10 persons or more, or non-work related gatherings of any size that [could not] maintain a consistent six-foot distance between persons from different households . . . ."  (Doc. # 40-8, at 2.)  The order also permitted "drive-in gatherings of any size" provided the gatherings complied with various rules.  *See infra* n.2 (defining rules for drive-in gatherings).  As defined in the order, "non-work related" gatherings included "church services, weddings, funerals services, social gatherings, concerts, festivals, sporting events, and similar events."  (Doc. # 40-8, at 3.)  While the Safer at Home

---

[2]  The order required participants at drive-in worship services to remain in their vehicles for the entirety of the service, to share the same residence as other participants in their vehicle, and to maintain six feet of distance from participants in other vehicles.

order walked backed certain restrictions, higher-risk businesses like entertainment venues, athletic facilities, and close-contact service providers remained closed. (*See* Doc. # 40-8, at 4.)

On May 8, 2020, in an effort to "preserve the economic well-being of the citizens of Alabama," Governor Ivey issued a declaration wherein she "determined that businesses should begin to reopen in May 2020 while following the applicable public health guidance to protect employees, customers, and members of the public." (Doc. # 40-2, at 9–10.)  Following the Governor's declaration, Dr. Harris issued an amended Safer at Home order that allowed close-contact service providers and athletic facilities to reopen on May 11, 2020.  (Doc. # 40-2, at 17–18.)  The amended Safer at Home order also prohibited "all non-work related gatherings of any size that [could not] maintain a consistent six-foot distance between persons from different households . . . ."  (Doc. # 40-2, at 16.)  Moreover, Dr. Harris's order provided that "[o]rganizers of religious gatherings are strongly encouraged to read and implement the Alabama Department of Health's 'Guidelines for Places of Worship' . . . ."  (Doc. # 40-2, at 16.)  These guidelines recommended that places of worship in Alabama implement COVID-19 screening protocols for employees and volunteers, that they increase their hygiene practices, and that they institute various social distancing measures.  (Doc. # 40-5, at 19.)  But they did not require those measures.

10

On June 30, 2020, Governor Ivey issued another emergency declaration. (Doc. # 40-3, at 1.)  That declaration is important for two reasons.  First, Governor Ivey used her authority under the AEMA to incorporate Dr. Harris's latest Safer at Home order, which was attached to the declaration, for the purposes of complying with the Alabama Administrative Procedure Act ("AAPA").[3]  Specifically, the declaration promulgated the attached Safer at Home order "as an order, rule, or regulation under the applicable provisions of the [AEMA]."  (Doc. # 40-3, at 12 (citing Ala. Code §§ 31-9-6(1) and 31-9-13).)  All of Governor Ivey's subsequent declarations incorporated Dr. Harris's Safer at Home orders in the same fashion.  Second, the declaration introduced, for the first time, enforcement language:  "The law-enforcing authorities of the state shall enforce [the Safer at Home] order as any other order, rule, or regulation promulgated by the Governor . . . and the penalty for violating it shall be a fine of not more than $500 or imprisonment in the county jail . . . ."  (Doc. # 40-3, at 12.)  Similar enforcement language appeared in subsequent declarations.

---

[3]  Dr. Harris's authority to issue emergency rules (*i.e.*, Safer at Home orders) was set to expire under the AAPA on July 15, 2020.  *See* Ala. Code § 41-22-5(b)(1) (providing that emergency rules "may be effective for a period of not longer than 120 days and shall not be renewable"); Ala. Code § 41-22-5(b)(2) ("An agency shall not adopt the same or substantially similar emergency rule within one calendar year from its adoption unless the agency clearly establishes it could not reasonably be foreseen during the initial 120-day period that such emergency would continue or would likely reoccur during the next nine months.").

The next major development concerning Defendants' COVID-19 policies came on July 15, 2020, when the Safer at Home order was amended to include a "mask requirement." (Doc. # 40-4, at 1.) The order read

> [E]ach person shall wear a mask or other facial covering that covers his or her nostrils and mouth at all times when within six feet of a person from another household in any of the following places: an indoor space open to the general public, a vehicle operated by a transportation service, or an outdoor public space where ten or more people are gathered.

(Doc. # 40-4, at 4.) Importantly, the mask requirement contained exceptions for practical necessity, physical exercise, effective communication, constitutionally protected activity, and essential job functions. (Doc. # 40-4, at 4–5.) Under the practical necessity exception, children six years of age or younger did not have to wear a mask nor did individuals with a medical condition or disability that prevented them from wearing a facial covering. Further, under the constitutionally protected activity exception, individuals actively providing or obtaining access to religious worship did not have to wear a mask, though they were strongly encouraged to do so. While the order preempted "any municipal ordinances concerning the use of facial coverings to prevent the spread of COVID-19," it provided that if the mask requirement was rescinded, "orders of county health officers and municipal ordinances pertaining to COVID-19 facial coverings may take effect according to their terms." (Doc. # 40-4, at 13.)

12

From July 2020 to March 2021, Governor Ivey extended the Safer at Home order by various declarations.  (Doc. # 53-1, at 2.)  These versions of the Safer at Home order were substantially similar to the July 15 Safer at Home order as it relates to Plaintiffs' challenges in this case.  Namely, the Safer at Home orders from July 15, 2020, to March 22, 2021,  contained each of the following:  (1) a ban on all non-work related gatherings of any size that could not maintain a consistent six-foot distance between persons from different households; (2) guidelines for places of worship; (3) a mask requirement subject to enumerated exceptions; and (4) general enforcement language.

On April 7, 2021, Governor Ivey changed course by issuing a new "Safer Apart" health order.  (Doc. # 53-2.)  The Safer Apart order provided that "[a]lthough COVID-19 remains a serious public health threat, . . . a new approach to COVID-19 mitigation measures is warranted based on rising vaccination rates, decreasing confirmed cases of COVID-19, and decreasing numbers of hospitalizations and deaths attributable to the virus."  (Doc. # 53-2, at 2.)  As relevant here, the Safer Apart order rescinded the mask requirement, removed all social distancing restrictions on gatherings, and did not contain guidelines for places of worship.  The Safer Apart order expired by its own terms on May 31, 2021.  *See* THE OFFICE OF ALABAMA GOVERNOR, *Twenty-seventh Supplemental State of Emergency: Coronavirus (COVID-19)*, governor.alabama.gov/newsroom/2021/05/twenty-

seventh-supplemental-state-of-emergency-coronavirus-covid-19/ (last visited June 1, 2021).

## C.  Plaintiffs

Plaintiff Jennifer Case ("Case") is a wife, mother, and homemaker who teaches her two children at home.  She alleges that Defendants' proclamations and orders have "denied her [the] right to attend the church of her choice, and to exercise the mode of worship and articles of faith to which she is guaranteed by both the Constitution of Alabama and the First Amendment to the United States Constitution." (Doc. # 40, at 3.)  To this end, Case testifies that her church "stopped having worship services on March 15, 2020, in compliance with the Governor's executive order . . . ." (Doc. # 40-6, at 3.)  However, Case also testifies that her church "resumed worship services in May 2020 but require[d] attendees to wear masks," thus preventing her from attending.  (Doc. # 40-6, at 3.)  Concerning her inability to wear a mask, Case testifies that "she has a medical condition that makes it difficult to breathe properly while wearing a mask" and "that when she has tried to wear a mask, it has quickly caused a severe headache and sore throat." (Doc. # 40-6, at 3.)  According to Case, various stores, shops, and restaurants have denied her admission due to her inability to wear a mask.  Case also alleges that she does not allow her children to wear a mask because doing so would violate her beliefs as a parent.

Plaintiff Rebecca Callahan ("Callahan") works as a school bus driver for the Shelby County, Alabama School District and has held that position for fifteen years. She testifies that on August 13, 2020, the Shelby County School Board implemented a policy requiring school bus drivers to wear face masks at all times while driving their buses. (Doc. # 40-6, at 9.) According to Callahan, she believes that the school board instituted this policy to comply with Defendants' mask requirement. Callahan alleges that she "believes that wearing . . . a facial covering while in transport of small children is a danger to them and to her personally and deprives her of personal freedom to define her own appearance." (Doc. # 40, at 4.)

Plaintiff Mark Liddle ("Liddle") is the Pastor of Dominion Baptist Church, in Shelby County, Alabama. Plaintiff Jim Nelson ("Nelson") is the Pastor of Church of the Living God, in Lawrence County, Alabama. Both Liddle and Nelson allege that Defendants' actions have resulted in the denial of "their right to preach and conduct 'in person' services at their respective churches and to conduct their services in a manner to which they are accustomed." (Doc. # 40, at 4.) They further allege that they have "been denied their right in accordance with their faith to provide prayer and loving care to the sick, elderly, and distraught of society." (Doc. # 40, at 4.) Based on these allegations, Liddle and Nelson contend that Defendants violated their constitutional rights of assembly and religious liberty.

Plaintiff Dr. R.S. Porter ("Porter") is a licensed chiropractor. He and his wife own and operate a chiropractic clinic in Huntsville, Alabama, called Functional Chiropractic. Porter alleges that his "business was severely damaged by the Defendants' actions and orders when patients cancelled and/or refused to keep appointments because of said orders and a requirement to wear facial coverings." (Doc. # 40, at 4.) Moreover, Porter alleges that "his property interest and family income were taken by the discriminatory and unfair mandate of the Defendants which affected his business." (Doc. # 40, at 4.)

Plaintiffs Scott Farr ("Farr") and Bruce Ervin ("Ervin") are co-owners of a barber shop in Shelby County, Alabama, called the Male Room. Both Farr and Ervin testify that Defendants' orders resulted in the closure of their business from March 18, 2020 until May 1, 2020. (Doc. # 40-6, at 20–21.) Although Defendants' orders permitted close-contact service providers, like the Male Room, to reopen on May 11, 2020, Farr and Ervin "felt obligated" to open on May 1 because they told their employees and customers that they would do so. As a result of opening their doors ten days early, Farr and Ervin testify that they received nine citations from the City of Hoover, Alabama. (Doc. # 40-6, at 20–21.) Farr and Ervin allege that Defendants' orders closing their business "were arbitrary, discriminatory, and an unjust seizure of their personal and real property in . . . violation of their rights under

both the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of the State of Alabama." (Doc. # 40, at 5.)

Plaintiffs bring eight causes of action against Defendants (in both their official and individual capacities), seeking both injunctive and monetary relief: (1) a void for vagueness challenge under the Fifth Amendment; (2) an establishment clause challenge under the First Amendment; (3) a free exercise challenge under the First Amendment; (4) a freedom of assembly challenge under the First Amendment; (5) a substantive due process challenge under the Fifth Amendment; (6) a "takings" challenge under the Fifth Amendment; (7) a contracts clause challenge under the Tenth Amendment; and (8) a separation of powers challenge under the Alabama Constitution.

Defendants advance several arguments in favor of their motion to dismiss Plaintiffs' second amended complaint. First, sovereign immunity (for official capacity claims) and qualified immunity (for individual capacity claims) prevent Plaintiffs from recovering money damages. Second, Plaintiffs lack standing to seek injunctive relief as to the requirements in Defendants' orders and proclamations that are no longer in effect and that such claims for such relief are otherwise moot. Third, Plaintiffs' separation of powers challenge under the Alabama Constitution runs contrary to the United States Supreme Court's holding in *Pennhurst State Sch. &*

17

*Hosp. v. Halderman*, 465 U.S. 89 (1984).  Fourth, and finally, Defendants argue that Plaintiffs' claims fail on the merits.

## V.  DISCUSSION

### A.  Jurisdictional Issues

The discussion begins, as it must, with the jurisdictional issues that Defendants raise as grounds for dismissing Plaintiffs' second amended complaint. Defendants' jurisdictional arguments implicate the doctrines of standing, mootness, and Eleventh Amendment immunity.  Each issue will be addressed in turn.

> ***1. Plaintiffs lack standing to seek retrospective injunctive relief against the provisions of Defendants' COVID-19 orders that expired prior to the filing of this lawsuit.***

Defendants contend that Plaintiffs lack standing to seek injunctive relief for orders that were no longer "in effect when this lawsuit was filed" because such relief is "premised on past conduct" and does not satisfy the redressability prong of the standing test.  (Doc. # 42, at 19.)  Defendants' argument is sound.

Because Article III confers federal court jurisdiction only on cases or controversies, a federal court lacks subject matter jurisdiction over a complaint that fails to make plausible allegations of standing.  *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).  "The party invoking federal jurisdiction bears the burden of establishing" standing. *Lujan*

*v. Defenders of Wildlife, Inc.*, 504 U.S. 555, 561 (1992). The burden of proof for establishing standing is the same as the general burden of proof at the pleading stage: plausibility. *See id.* Further, "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)).

The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (citations omitted). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (citation omitted).

Second, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'" *Lujan*, 505 U.S. at 560–61 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43). The salient

19

inquiry regarding redressability is whether "the effect of the court's judgment on the defendant—not an absent third party— . . . redress[es] the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019).

Here, Plaintiffs seek injunctive relief concerning the "discriminatory closing of businesses" and "stay at home orders." (Doc. # 40, at 26.) However, when Plaintiffs filed their complaint on September 24, 2020, the provisions of Defendants' orders that closed certain businesses in Alabama and directed individuals to stay at home except for enumerated essential activities were no longer in effect. *See Cook v. Bennet*, 792 F.3d 1294, 1298 (11th Cir. 2015) ("Standing is determined at the time the plaintiff files its complaint.").[4] Indeed, those provisions expired more than four months before Plaintiffs filed their complaint. Thus, an injunction prohibiting Defendants from enforcing provisions of their orders that have expired will not redress Plaintiffs' alleged injury. *See Smith v. Ivey*, No. 2:20-cv-237-ECM, 2020 WL 6802023, at *11 (M.D. Ala. Nov. 19, 2020) (finding that the plaintiff could not establish redressability because, among other things, the defendant's challenged

---

[4] Defendants' August 27 Safer at Home order was in effect at the time Plaintiffs filed their complaint. (Doc. # 40-5, at 1–11.) As relevant here, this Safer at Home order contained the mask requirement, a ban on all non-work related gatherings of any size, including drive-in gatherings, that could not maintain a consistent six-foot distance between persons from different households, and guidelines for houses of worship, all aimed at reducing the transmission of COVID-19. Further, under the August 27 Safer at Home order, all businesses in Alabama, including retailers and close-contact service providers, were open to the public subject to various public health requirements.

action was no longer in effect at the time the plaintiff filed her suit);  *see also Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").  Put differently, Plaintiffs' redress, as it relates to injunctive relief against the provisions that expired prior to the filing of the complaint, has already occurred.

In an attempt to skirt the redressability requirement, Plaintiffs argue that the provisions that expired prior to the filing of the complaint "are capable of repetition while evading review and concern ongoing and continuous violations of federal law." (Doc. # 49, at 7.)  Plaintiffs' argument fails for two reasons.  First, the "capable of repetition, yet evading review" doctrine is an exception to mootness.  Standing, however, "admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum."  *Friends of the Earth*, 528 U.S. at 191 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998)).  Second, the expired provisions do not present an ongoing and continuous violation of federal law because they are no longer in effect.  *See Steel Co.*, 523 U.S. at 109 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." (quotations and citation omitted)).  Hence,

21

Plaintiffs lack standing to seek retrospective injunctive relief against the expired provisions.

### 2. *Plaintiff Porter lacks standing as to Counts 6 and 7.*

Porter seeks damages for alleged violations of the Takings Clause (Count 6) and the Contracts Clause (Count 7) of the United States Constitution.  In Count 6, he alleges that his business "was adversely affected and . . . suffered damages when requirements of social distancing, facial coverings (masks), and emergency maximum occupancy rates of 50%, *caused patients and clientele* to discontinue services." (Doc. # 40, at 23 (emphasis added).)  In Count 7, he alleges that he "sold monthly memberships by which patients could pay a monthly membership fee and utilize his chiropractic services at any time," but that "Defendants' orders *effectively* canceled these contracts and prevented [him] from enforcing them." (Doc. # 40, at 24 (emphasis added).)  These allegations fail to confer standing because they do not identify an injury traceable to Defendants.

Specifically, the allegations in Count 6 demonstrate that the source of Porter's injury[5] was caused by his patients' decision to discontinue services—not Defendants' actions.  The same is true concerning Count 7 because nothing in

---

[5]  To be sure, Porter's allegations that Defendants' orders resulted in him experiencing economic harm are sufficient to establish an injury-in-fact.  *See Lewis*, 944 F.3d at 1296 (explaining that "[e]conomic harm . . . is a well-established injury-in-fact under federal standing jurisprudence") (cleaned up).

Defendants' orders required Porter's patients to cancel their monthly memberships. In fact, Defendants' orders defined Porter's chiropractic clinic as an "essential business," thus allowing it to remain open to the public.  (Doc. # 40-2, at 4.)[6]  The fact that Defendants' orders created an express exception for Porter's business to remain open underscores that it was his patients' decision—not Defendants—to cancel their monthly memberships (or appointments) with the clinic.  Because the cause of Porter's injuries is tied to the decisions of independent third parties not before the court, his injuries are not traceable to Defendants.  *See Lujan*, 504 U.S. at 561–62 (explaining that when traceability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," standing will be "substantially more difficult to establish") (cleaned up). Accordingly, Porter lacks standing as it relates to his damages claim in Counts 6 and 7.

---

[6]  This stands in stark contrast to the circumstances Farr and Ervin allege.  Defendants' orders explicitly directed that Farr and Ervin, unlike Porter, close their business for more than a month with no exception.  Consequently, Farr and Ervin have standing to pursue damages in connection with Counts 6 and 7.

### 3. *Plaintiffs' claims for prospective injunctive relief are moot.*[7]

Plaintiffs also seek prospective injunctive relief "prohibiting Defendants from enforcing the orders . . . with regard to wearing of masks, unconstitutional regulation of houses of worship . . . and social distancing." (Doc. # 40, at 26.) Defendants assert that Plaintiffs' claims for such relief are now moot in light of the newly issued Safer Apart order. (Doc. # 53.) Defendants are correct.

"Under Article III of the Constitution, federal courts may only hear 'cases or controversies.'" *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1250 (11th Cir. 2008) (quoting *Lujan*, 504 U.S. at 559–60). "The doctrine of mootness, which evolved directly from Article III's case-or-controversy limitation, provides that 'the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Id*. at 1251–52 (quoting *Tanner Adver. Group, L.L.C. v. Fayette Cty., Ga*., 451 F.3d 777, 785 (11th Cir. 2006)

---

[7] Even though Plaintiffs' claims for injunctive relief are moot, Plaintiffs also lack standing as it relates to injunctive relief against the mask requirement. Simply put, the allegations in the complaint do not demonstrate that a favorable ruling prohibiting Defendants from enforcing the requirement will likely redress Plaintiffs' alleged injuries. *See Cangelosi v. Edwards*, No. 20-1991, 2020 WL 6449111, at *4 (E.D. La. Nov. 3, 2020) (finding that the plaintiff lacked standing to challenge a statewide mask order because "[t]he proposition than an injunction against the Governor would relieve the plaintiff of having to wear a face covering in order to enter certain businesses [was] highly speculative"); *Parker v. Wolf*, —F. Supp. 3d—, No. 20-cv-1601, 2020 WL 7295831, at *13 (M.D. Penn. Dec. 11, 2020) (finding that the plaintiffs did not have standing to pursue an injunction prohibiting government officials from enforcing a mask mandate because such relief would not redress the plaintiffs' alleged injuries in light of the fact that "those injuries [would] almost certainly persist even in the absence of state-level enforcement . . ."), *appeal docketed*, No. 20-3518 (3d Cir. Dec. 14, 2020).

(*en banc*)).  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (cleaned up).  And the Eleventh Circuit has "held that a case must be dismissed as moot if events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (cleaned up).

Here, the April 7, 2021 Safer Apart order, which superseded all of Defendants' previous orders, eliminated the provisions of the previous orders that formed the basis of Plaintiffs' request for prospective injunctive relief.  In particular, the Safer Apart order rescinded the mask requirement, removed all social distancing restrictions on gatherings, and did not contain guidelines for places of worship. (Doc. # 53-2, at 2–7.)  With these provisions no longer in existence, there is no live case or controversy to adjudicate as to Plaintiffs' claims for prospective injunctive relief.  But that is not the end of the matter.  There are two exceptions to the mootness doctrine that warrant discussion:  Voluntary cessation and capable of repetition yet evading review.  For the reasons explained below, neither exception applies.

Beginning with the first exception, "a defendant's 'voluntary cessation of allegedly illegal conduct does not [necessarily] moot a case.'"  *Keohane*, 952 F.3d

at 1267 (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (alteration added)).  "So when a defendant contends that a plaintiff's claim has become moot as a result of the defendant's own independent decision to cease some disputed action, it usually bears the burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Id*. (cleaned up).  However, when government actors, like Defendants, take steps to cease allegedly illegal conduct, "there is a rebuttable presumption that the objectionable behavior will *not* recur."  *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (emphasis in original). Indeed, the Eleventh Circuit has recognized that "governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."  *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1256 (11th Cir. 2017) (en banc) (quoting *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328–29 (11th Cir. 2004)).  Thus, "once the repeal of an ordinance has caused . . . jurisdiction to be questioned, [the plaintiff] bears the burden of presenting affirmative evidence that its challenge is no longer moot."  *Id*. (alteration in original).  "Mere speculation that [a defendant] may return to its previous ways is no substitute for concrete evidence . . . ."  *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1334 (11th Cir. 2005).

Against this backdrop, "[t]he key inquiry . . . is whether the evidence" provides "a reasonable expectation that" Defendants "will reverse course and reenact the allegedly offensive" provisions of their orders. *Flanigan's Enters., Inc. of Ga.*, 868 F.3d at 1256.  To make this determination, courts examine three factors:  (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate . . . jurisdiction"; (2) "whether the government's decision to terminate the challenged conduct was unambiguous"; and (3) "whether the government has consistently maintained its commitment to the new policy . . . ." *Id.* at 1257.  While these factors provide guidance, they "should not be viewed as exclusive nor should any single factor be viewed as dispositive." *Id.*  Instead, "the entirety of the relevant circumstances should be considered and a mootness finding should follow when the totality of those circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation." *Id.*

As to the first factor, it is highly unlikely that Defendants' decision to terminate the challenged provisions—a choice with far reaching implications for the public health of all Alabama citizens—was anything other than a product of substantial deliberation.  In fact, the plain language of the Safer Apart order makes clear that Defendants carefully considered a number of factors (*i.e.*, rising vaccination rates, decreasing confirmed cases of COVID-19, and decreasing

numbers of hospitalizations and deaths attributable to the virus) when they decided to change their approach to mitigating the spread of COVID-19. Moreover, Defendants' reliance on these factors, which are wholly separate from this lawsuit, lends further support to substantial deliberation. *See id.* (holding that the defendant government entity had "undertaken the 'substantial deliberation' required to" show "that there [was] no reasonable expectation that it [would] reenact the allegedly offensive provision of its Code" when the government entity had "offered persuasive explanations, not dependent upon [the] litigation, to explain its course of conduct in repealing" the challenged actions) (alterations added). The record here broadly supports the substantial deliberation by State officials in dealing with a public health emergency of unknown proportions.

Next, Defendants' decision to remove the disputed provisions from the Safer Apart order "is plainly an unambiguous termination of the challenged conduct." *Id.* at 1261. To illustrate, Defendants have "not merely declined to enforce" the disputed provisions against Plaintiffs. *Id.* Conversely, they have "removed the challenged portion[s]" of the orders altogether. *Id.* (alteration added); *see also Keohane*, 952 F.3d at 1268 (holding that the government defendant unambiguously terminated the challenged policy when it removed the policy in its entirety and did not simply decline to enforce the policy against the plaintiff).

The third factor—whether Defendants have consistently maintained their commitment to the new Safer Apart order—is a closer call.  On the one hand, it is difficult to determine Defendants' commitment to the Safer Apart order given that it was enacted just a short time ago (April 7, 2021).  On the other, Plaintiffs do not plausibly allege that Defendants have enforced, threatened to enforce, or demonstrated a willingness to enforce the challenged provisions of the previous orders,[8] and Defendants have publicly repealed, rescinded, or otherwise eliminated those provisions.  *See Flanigan's Enters., Inc. of Ga.*, 868 F.3d at 1262–63 ("Thus, where the City has shown no inclination towards enforcing the old scheme, we are inclined to believe that the repeal of an otherwise unenforced code provision and the public embrace of that decision sufficiently serves to underscore the City's commitment to its new legislative scheme.").  Ultimately, this tension is immaterial because the first two factors cut in favor of Defendants and tip the scale toward a mootness finding.  Therefore, there is no reasonable expectation that Defendants will return to the challenged provisions of the now extinct Safer at Home orders.

---

[8] The only allegation that Plaintiffs make concerning Defendants' enforcement of the Safer at Home order is that Farr and Ervin received nine citations from the City of Hoover when they decided to open their business on May 1, 2020—ten days before close-contact service providers were allowed to reopen.  (Doc. # 40, at 14.)  Plaintiffs further allege that "[t]he City of Hoover was acting as an enforcement agent for . . ." Defendants when it issued the citations.  (Doc. # 40, at 14.)  This allegation amounts to a legal conclusion and is not enough to demonstrate that Defendants enforced the challenged provisions.  *See Iqbal*, 556 U.S. at 678 (explaining that "the tenant that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions").

Turning to the second exception, a plaintiff's claim for prospective injunctive relief is not moot "when the action being challenged by the lawsuit is capable of being repeated *and* evading review . . . ." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (emphasis in original). The capable of repetition yet evading review exception "is narrow and applies only in exceptional circumstances." *Id.* (cleaned up). Courts "may apply this exception when (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Wood v. Raffensperger*, 981 F.3d 1307, 1317 (11th Cir. 2020) (cleaned up).

To support their argument that the capable of repetition yet evading review exception applies, Plaintiffs contend that "Defendants can roll back their orders and reinstate more severe restrictions" at any point. (Doc. # 49, at 8.) According to Plaintiffs, this is likely because "there are already new COVID strains that are posed to cause even more issues for years to come." (Doc. # 49, at 8.) Here's the problem with Plaintiffs' assertions—they amount to nothing more than speculation. And speculation is not enough to save Plaintiffs' claims for prospective injunctive relief from being moot. *See Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1297 (11th Cir. 2018) ("'The remote possibility than an event might recur is not enough to overcome mootness . . . .'") (quoting *Al Najjar*, 273 F.3d at 1336). In any event, there is no

reasonable expectation that Plaintiffs will be subjected to the challenged provisions in the future for the reasons previously discussed. *See supra*, at 27–29.

Given that the challenged provisions are no longer in existence and that neither exception to the mootness doctrine applies, Plaintiffs' claims for prospective injunctive are moot.[9]

### 4.   *Eleventh Amendment immunity bars Plaintiffs' claims for money damages against Defendants in their official capacities.*

Defendants correctly assert that any suit against them in their official capacities for money damages is due to be dismissed because they are entitled to Eleventh Amendment immunity. (Doc. # 42, at 15.)  A state is entitled to sovereign immunity and may not be sued unless it consents to suit or unless Congress abrogates sovereign immunity. *Pennhurst*, 465 U.S. at 98–99.  Suits brought pursuant to 42 U.S.C. § 1983, like the one here, are no exception to the rule. *Quern v. Jordan*, 440 U.S. 332, 342 (1979).  This immunity extends to state officials for claims brought against them in their official capacities for monetary damages because an award of damages would be paid by the state, thus making the state a "real, substantial party in interest." *Pennhurst*, 465 U.S. at 101 (citation and quotations omitted).  Here, Defendants—the Governor of Alabama and the State Health Officer of Alabama—

---

[9]  Because the Safer Apart order rendered Plaintiffs' claims for prospective injunctive relief moot, the court need not address Defendants' argument that the Eleventh Amendment bars such relief.

are unquestionably state officials.   Thus, Defendants are entitled to Eleventh Amendment immunity on Plaintiffs' claims against them in their official capacities for monetary damages.   *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999) (explaining that "the Eleventh Amendment bars suits against state officials in federal court seeking retrospective or compensatory relief . . . .").

### 5.  *Eleventh Amendment Immunity also bars Count 8.*

Plaintiffs allege in Count 8 that Defendants' proclamations and orders violate Alabama's separation of powers doctrine.  (*See* Doc. # 40, at 25.)  Specifically, they claim that Defendants' actions are "null and void" because they usurped the role of the legislature, thus violating the Alabama Constitution.   In other words, Plaintiffs contend that Defendants—state officials—have violated state law.   However, the United States Supreme Court has held that the Eleventh Amendment plainly bars such a claim.   *See Pennhurst*, 465 U.S. at 121 (concluding that "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is [barred] by the Eleventh Amendment") (alteration added). Accordingly, Count 8 is due to be dismissed on Eleventh Amendment immunity grounds.

## B.  Qualified Immunity

Defendants raise the defense of qualified immunity as it relates to Plaintiffs' claims against them in their individual capacities for money damages.  (*See* Doc. #

42, at 16.)  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   Qualified immunity serves to balance "two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."   *Id*.   As a threshold matter, defendants asserting the defense of qualified immunity "must first establish that they were acting within the scope of their discretionary authority when the alleged wrongful acts occurred."  *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016) (citation omitted).  Despite Plaintiffs' protestations to the contrary (*see* Doc. # 49, at 3–6), Defendants have established that they acted within the scope of their discretionary authority under the AEMA, the Alabama Code, and Alabama's police power when they issued orders in response to COVID-19.  *See supra*, at 4–6. Accordingly, "the burden shifts to [Plaintiffs] to establish that qualified immunity is inappropriate."  *Melton*, 841 F.3d at 1221 (citation omitted).

To establish that Defendants are not entitled to qualified immunity, Plaintiffs must satisfy two elements:  (1) that Defendants' actions "violated a constitutional right" and (2) the "right was clearly established at the time of the alleged violation."

*Patel v. Lanier Cty. Ga.*, 969 F.3d 1173, 1188 (11th Cir. 2020) (citation and internal quotation marks omitted).  "The determination of these elements may be conducted in any order."  *Melton*, 841 F.3d at 1221 (citing *Pearson*, 555 U.S. at 236).  Here, as to some claims, the complaint's allegations do not establish that Defendants' actions violated Plaintiffs' constitutional rights, thus failing the first element of the qualified immunity test.  As to other claims, the complaint's allegations do not demonstrate a violation of a clearly established constitutional right, thus failing the second element of the qualified immunity test.  The subsequent discussion addresses each Count in Plaintiffs' complaint in turn.  *Corbitt v. Vickers*, 929 F.3d 1304, 1313 (11th Cir. 2019), *cert. denied*, 141 S. Ct. 110 (2020).

### 1.  *Void for Vagueness (Count 1)*

In Count 1, Plaintiffs contend that Defendants' COVID-19 orders and proclamations are unconstitutionally vague.  They allege that "the Governor and State Health Officer, through a common program of unilateral executive proclamations and orders . . . have subjected and continue to subject all Plaintiffs . . . to vague and arbitrary laws in violation of the Fourteenth Amendment."  (Doc. # 40, at 12.)  Plaintiffs' void-for-vagueness challenge is tied to the following provisions of Defendants' orders:  (1) the six-foot social distancing requirement; (2) business closures; (3) restrictions on religious activity; and (4) the mask requirement.

Vague laws trespass on the constitutional guarantee of due process.  *See Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).  A statutory provision is void for vagueness if it (1) fails to provide people of ordinary intelligence with fair notice of what conduct it proscribes or (2) is so unclear that it authorizes or encourages discriminatory enforcement.  *United States v. Williams*, 553 U.S. 285, 304 (2008).  To succeed on a void-for-vagueness challenge, Plaintiffs must show that the statutory provision is "impermissibly vague in all of its applications."  *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1136, 1139 (11th Cir. 2014) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)).  If the statutory provision at issue clearly proscribes some conduct in which the challenger engages, the challenger cannot complain of the statute's vagueness.  *Id.* at 1139–40.

Importantly, courts do not apply these principles to hypotheticals.  "Litigants may not comb the statute books for poorly drafted laws and sue to enjoin their enforcement."  *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349 (11th Cir. 2011).  Rather, courts review laws for vagueness "only when a litigant alleges a constitutional harm."  *Id.*  Vague laws can harm in two ways.  One harm occurs when a person is prosecuted for violating a vague law.  *Id.*  The other occurs when one is "chilled from engaging in constitutional activity."  *Id.* at 1350.  Given that a litigant cannot argue that a law is vague based on how it might apply in a

hypothetical situation, courts "consider whether a statute is vague as applied to the particular facts at issue." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010).

Beginning with the social distancing requirement, Plaintiffs allege that "[s]ince March 19, [Defendants have] routinely required people to keep a 6-foot distance from each other." (Doc. # 40, at 12.) They further allege that Defendants 'have never explained why they ordered people to stay six feet apart instead of four, five, seven, or ten feet" and that the social distancing requirement "is arbitrary on its face." (Doc. # 40, at 13.) Based on these allegations, Plaintiffs claim that they have been "subjected to vague and arbitrary restrictions of assembly in violation of the Due Process of the Fourteenth Amendment." (Doc. # 40, at 13.) But, contrary to Plaintiffs' assertions, there is nothing vague about what the social distancing provision requires—six feet of separation from others. In fact, as Defendants correctly note, "it is difficult to envision a requirement with more mathematical precision." (Doc. # 42, at 30.) Thus, the social distancing requirement comports with due process because it provides "a person of ordinary intelligence fair notice of what is prohibited" and is not "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

Next, Plaintiffs Farr and Ervin allege that they "have been harmed by Defendants' vague and arbitrary business restriction and shutdown orders." (Doc. #

40, at 14.)   The crux of Farr's and Ervin's argument is that Defendants' orders "arbitrarily classified" their business, a barber shop, as "non-essential," resulting in its closure from March 27 until May 11.   (Doc. # 40, at 13.)   While Farr and Ervin take issue with how Defendants' orders classified their business, there was nothing vague about what the orders required.   For example, the March 27 order made clear that non-essential businesses, including close-contact service providers, were required to close to non-employees or not take place.   And the order expressly defined close-contact service providers to include barber shops.   (*See* Doc. # 40-1, at 19.)   This language demonstrates that Farr and Ervin had clear notice that their business fell into the non-essential category and was required to close.   *See Hartman v. Acton*, —F. Supp. 3d—, 2020 WL 1932896, at *5–6 (S.D. Ohio April 21, 2020) (rejecting the plaintiffs' void-for-vagueness challenge to the defendant's COVID-19 business closure order because the order provided "clear and fair warning of what conduct [was] proscribed").

Further, Plaintiffs' vagueness challenge to provisions of Defendants' orders that placed limitations on religious gatherings fails for similar reasons.   Consider the April 3, 2020 order.   It clearly provided that individuals were permitted to leave their place of residence to attend religious services.   (*See* Doc. # 40-2, at 1–2.)   True, the order limited attendance at religious services to specific circumstances, but it provided a detailed explanation of what those circumstances were.   (*See* Doc. # 40-

37

2, at 2–3 (allowing attendance at religious services provided that "the event involv[ed] fewer than ten people" and attendees "maintain[ed] a consistent six-foot distance from another" or if the event was a drive-in worship service that adhered to enumerated rules).)  There is nothing vague about this language because it plainly delineated what conduct was proscribed.  There may be other constitutional problems with this aspect of the orders, but vagueness is not one of them.

Plaintiffs' vagueness challenge to the mask requirement also falls short.  The only allegations in Plaintiffs' complaint implicating constitutional harm due to the claimed vagueness of the mask requirement (*i.e.*, the only allegations warranting discussion) center on religious activity.[10]  Specifically, Plaintiffs allege that "worship services have been restricted by the mask mandate which only gives a vague and arbitrary exception that chills and infringes Free Exercise."  (Doc. # 40, at 15.)  The exception that Plaintiffs take issue with reads: "The facial-covering requirement does not apply to . . . [a]ny person who cannot wear a facial covering because he or she is actively providing or obtaining access to religious worship

---

[10]   Confusingly, Plaintiffs embed in Count 1 an allegation that the mask requirement violates their substantive due process rights.  (*See* Doc. # 40, at 17 ("Moreover, the executive branch's arbitrary actions requiring every person in Alabama to wear a mask in public as described in Defendants' orders . . . rise to the level of shocking the conscience, thus violating the substantive due process right against arbitrary government action") (internal quotations and citation omitted).)  To the extent that Plaintiffs seek to bring a separate substantive due process claim, that claim is due to be dismissed because it lacks merit.  *See Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009) ("To rise to the conscience-shocking level, conduct most likely must be intended to injure in some way unjustifiable by any government interest.").

. . . ." (Doc. # 40-4, at 5.)  Plaintiffs complain that there is no definition of the phrase "obtaining access to religious worship," and, as a result, the exception does "not provide fair warning . . . as to what conduct is permitted and what is prohibited." (Doc. # 40, at 17.)

The fact that the exception does not define the phrase "obtaining access to religious services" does not render it vague.  Indeed, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  Moreover, whether an individual is actively providing or obtaining access to religious services is a question of fact. *See Williams*, 553 U.S. at 306 (holding that the statutes at issue were not impermissibly vague because a conviction under them turned on questions of fact).  Put another way, whether an individual qualifies under the exception "is a true-or-false determination, not a subjective judgment such as whether conduct is 'annoying' or 'indecent.'" *Id*.  And in the event that a close case might arise under the religious worship exception during a criminal enforcement action, "[t]he problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id*.  (citing *In re Winship*, 397 U.S. 358, 363 (1970)).

To save their vagueness challenge to the mask requirement's religious activity exception, Plaintiffs argue a long line of hypotheticals:

> Indeed, what does "actively obtaining access" mean? . . . If a person is on church property, must they be masked at any point? Should congregants mask between prayers and hymns or while at their seat? Is this completely up to individual discretion? Is serving the community, like working in a kitchen run by one's church religious worship? Is being baptized religious worship?

(Doc. # 49, at 14.) These hypotheticals are wholly divorced from the facts at issue and do not make the otherwise clear text of the exception vague. *See Holder*, 561 U.S. at 18.

Finally, to the extent that Plaintiffs argue that the social-distancing requirement, the business restrictions, the limitations on religious activity, and the mask requirement are capable of arbitrary and discriminatory enforcement, that argument fails. To be sure, arbitrary and discriminatory enforcement is relevant in vagueness cases. For instance, a statute cannot leave police officers free to decide, case-by-case, what is illegal. *See Chicago v. Morales*, 527 U.S. 41, 61 (1991); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). So, if a law is enforced in different ways against different people, that may mean the law is vague. But at the same time, "discriminatory enforcement does not necessarily mean that the ordinance that is being enforced is itself void-for-vagueness. The most clearly stated law against running red lights . . . could be enforced discriminatorily by the police, if they so chose." *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 387 (11th Cir. 1991). Instead, a vagueness claim must show that the text of the law itself is vague. *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir.

2013).  Here, the text of the provisions that Plaintiffs challenge is not facially vague, and the complaint is devoid of any allegations showing that Defendants ever enforced the provisions, let alone enforced them in an arbitrary manner.

Accordingly, Defendants are entitled to qualified immunity on Count 1 because Plaintiffs have failed to plausibly allege a constitutional violation under the void-for-vagueness doctrine.

### 2. Free Exercise (Count 3)

In Count 3, Plaintiffs allege that certain of Defendants' actions violated their rights under the Free Exercise Clause in two ways.  First, Plaintiffs take issue with the April 3, 2020 order.  That order, although categorizing "religious entities" as "essential" and permitting drive-in worship services, restricted in-person worship services to a maximum of 9 socially distanced people.  At the same time, secular "essential retailers"—which included, among other entities, supermarkets, liquor stores, pharmacies, bicycle shops, and "big box" stores—could remain open provided that occupancy was "no more than 50 percent of the normal occupancy load"[11]; employees of essential retailers did "not knowingly allow customers or

---

[11]   The April 3, 2020 order defined "essential retailers" as "all supermarkets, food and beverage stores, including liquor stores and warehouse clubs, food providers, convenience stores, office-supply stores, bookstores, computer stores, pharmacies, health care supply stores, hardware stores, home improvement stores, building materials stores, stores that sell electrical, plumbing, and heating materials, gun stores, gas stations; auto, farm equipment, bicycle, motorcycle, and boat supply and repair stores, and businesses that ship or deliver groceries, food, and goods directly to residences."  (Doc. # 33-1, at 5.)

patrons to congregate within six feet of one another"; and essential retailers took "reasonable steps to comply with guidelines on sanitation from the Centers for Disease Control and Prevention and the Alabama Department of Public Health." (Doc. # 33-1, at 8.)  Second, Plaintiffs contend that, "[s]ince the May 8 order to the present day, worship services have been limited by [Defendants] to capacity no more than what 6 foot social distancing allows and [have been] imposed upon by 'guidelines' in clear violation of the Free Exercise Clause."  (Doc. # 40, at 20 (alteration added).)

Under the Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, Congress "shall make no law . . . prohibiting the free exercise of religion." U.S. Const. amend. I.  "Government is not free to disregard the First Amendment in times of crisis. At a minimum, that Amendment prohibits government officials from treating religious exercises worse than comparable secular activities, unless they are pursuing a compelling interest and using the least restrictive means available."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020) (Gorsuch, J., concurring).  Generally, only where a law "is neutral and of general applicability" does the compelling interest standard yield way to "rational basis scrutiny."  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citation omitted).  Thus, "[i]f a law is one that is neutral and generally applicable," the plaintiff need only "show that there is not a

42

legitimate government interest or that the law is not rationally related to protect that interest." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1255 n.21 (11th Cir. 2012) (alteration added).

> Neutrality is lacking where
>
> the object of a law is to infringe upon or restrict practices because of their religious motivation . . . .  To determine the object of a law [courts] begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face.  A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context.

*Lukumi*, 508 U.S. at 533–34.  But "[f]acial neutrality is not determinative" because the Free Exercise Clause "forbids subtle departures from neutrality . . . and covert suppression of particular religious beliefs."  *Id*. at 534 (internal quotations and citations omitted) (alteration added).  Legislative history and "the effect of a law in its real operation" help illuminate whether an otherwise facially neutral law impermissibly targets religion.  *Id*. at 535.

Concerning the requirement of general applicability, the Supreme Court has explained:

> All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice.  The Free Exercise Clause protect[s] religious observers against unequal treatment, . . . and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation.

*Id*. at 542–43 (citation and internal quotations omitted) (alteration in original). Stated differently, a challenged governmental action is not generally applicable if it is underinclusive.  *Id*. at 542.

The recent Supreme Court decision in *Roman Catholic Diocese of Brooklyn* provides support for Plaintiffs' position that their First Amendment freedoms have been compressed unnecessarily during the COVID-19 pandemic.  *See* 141 S. Ct. at 63.  There, the Court confronted a free exercise challenge to occupancy limitations at public places of worship that were more restrictive than occupancy limitations at businesses selling groceries and liquor and providing acupuncture and transportation services.  Enjoining the Governor of New York from enforcing the occupancy restrictions on the movants' religious services, the Court held that "[s]temming the spread of COVID-19 is unquestionably a compelling [state] interest, but it is hard to see how the challenged regulations can be regarded as 'narrowly tailored.'"  *Id.* at 67 (alteration added).  In a concurring opinion, Justice Gorsuch observed that the 10- and 25-person occupancy limitations at issue applied "even to the largest cathedrals and synagogues, which ordinarily hold hundreds," and "no matter the precautions taken, including social distancing, wearing masks, leaving doors and windows open, forgoing singing, and disinfecting spaces between services."  *Id.* at 69 (Gorsuch, J., concurring).  He concluded that the only rationale for subjecting religious institutions to the occupancy restrictions

44

seem[ed] to be a judgment that what happens there just isn't as 'essential' as what happens in secular spaces. Indeed, the Governor is remarkably frank about this: In his judgment laundry and liquor, travel and tools, are all 'essential' while traditional religious exercises are not. That is exactly the kind of discrimination the First Amendment forbids.

*Id.*

Here, akin to the disparate occupancy restrictions in *Roman Catholic Diocese of Brooklyn*, no matter the square footage of the houses of worship in Alabama— from big city megachurches to small town synagogues—attendance was limited to no more than 9 people so long as 6-foot spacing could be achieved. Yet, big box retailers—take for example Costco whose average store is 146,000, square feet, *see* https://investor.costo.com/corporate-profile-2, (last visited May 17, 2021)—could accommodate many more, likely hundreds more, people under the 50%-occupancy restriction. The April 3, 2020 order provides no justification for treating gatherings in a house of worship differently from gatherings in a big box retailer.

To the extent that courts have reasoned that the distinction lies in the "purpose of shopping," which "is not to gather with others . . . but to purchase the necessary items and then leave as soon as possible," *see Cassell v. Snyders*, 458 F. Supp. 3d 981, 996 (N.D. Ill. 2020), there is nothing in the April 3, 2020 order that placed time limitations on visits to big box retailers, liquor stores, or the local supermarkets. People could gather inside at Home Depot, Publix, or a local CVS for as long as they liked so long as the maximum occupancy rate for the business did not exceed half-

capacity and the business did not knowingly allow the gatherers to inch closer together than 6 feet.   However, houses of worship did not enjoy the same gathering luxuries under the April 3, 2020 order:  They had to limit occupancy to 9 people no less than 6-feet apart no matter if the space was 324-square feet (the minimum square footage needed to house 9 people 6-feet apart) or 1,500-square feet (a square footage that would have accommodated 40 people 6 feet apart).  The April 3, 2020 order did not imagine less restrictive rules; to illustrate, "the maximum attendance at a religious service could be tied to the size of the church or synagogue." *Roman Catholic Diocese of Brooklyn*, 114 S. Ct. at 67.  Thus, the April 3, 2020 order was likely a violation of the Free Exercise Clause.

Notwithstanding the similarities between the Governor of New York's executive order and the State of Alabama's April 3, 2020 order, and even assuming the allegations demonstrate that the occupancy restrictions for religious spaces violate the Free Exercise Clause, the Supreme Court's decision in *Roman Catholic Diocese of Brooklyn* cannot clearly establish the law as of April 3, 2020, because it was handed down on November 25, 2020.   Neither Governor Ivey nor Dr. Harris had the benefit of the Supreme Court's decision in *Roman Catholic Diocese of Brooklyn* when the April 3, 2020 order was implemented.  In other words, this decision could not have put Defendants on fair notice that the occupancy restrictions on houses of worship were unconstitutional.

Moreover, Plaintiffs would be hard pressed to come up with a decision predating April 3, 2020, that clearly establishes the law, so not surprisingly, they have not done so.  Between March 13, 2020—the date the Governor declared a state emergency based on the COVID-19 pandemic—and April 3, 2020, the medical data and CDC guidance on COVID-19 were rapidly evolving and continuously changing. The rationale for the restrictions imposed by the Governor and the State Health Officer on April 3, 2020, absent any demonstration that they harbored animosity against religious institutions, must be viewed though a temporal lens.

As recognized by some of our nation's Justices, state government officials deserved a measure of leniency during the early stages of the COVID-19 pandemic when there was scant information known about the illness and its effects:

> For months now, States and their subdivisions have responded to the pandemic by imposing unprecedented restrictions on personal liberty, including the free exercise of religion.  This initial response was understandable.  In times of crisis, public officials must respond quickly and decisively to evolving and uncertain situations.  At the dawn of an emergency—and the opening days of the COVID–19 outbreak plainly qualify—public officials may not be able to craft precisely tailored rules.  Time, information, and expertise may be in short supply, and those responsible for enforcement may lack the resources needed to administer rules that draw fine distinctions.  Thus, at the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules. In general, that is what has happened thus far during the COVID–19 pandemic.

> But a public health emergency does not give Governors and other public officials carte blanche to disregard the Constitution for as long as the medical problem persists. As more medical and scientific evidence becomes available, and as States have time to craft policies in

47

> light of that evidence, courts should expect policies that more carefully
> account for constitutional rights.

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2604–05 (2020) (Alito,

J., with whom Thomas, J., and Kavanaugh, J., joined, dissenting); *see also Roman*

*Cath. Diocese of Brooklyn*, 141 S. Ct. at 70 (observing that in a prior decision, the

Chief Justice "expressed willingness to defer to executive orders in the pandemic's

early stages based on the newness of the emergency and how little was then known

about the disease," and that "[a]t that time, COVID had been with us, in earnest, for

just three months," but that "[n]ow, as we round out 2020 and face the prospect of

entering a second calendar year living in the pandemic's shadow, that rationale has

expired according to its own terms" (citing *S. Bay United Pentecostal Church v.*

*Newsom*, 140 S. Ct. 1613 (Roberts, C.J., concurring)).

The point in time in which Governor Ivey and Dr. Harris acted, *i.e.*, April 3,

2020, was just three weeks after Governor Ivey had declared a state public health

emergency.  Then, time was of the essence, and information and expertise were in

short and rare supply.  However, as time passed and Governor Ivey and Dr. Harris

garnered more medical and scientific data on COVID-19, the occupancy restrictions

on religious activities evolved and eased and, since May 8, 2020, have remained the

same for both religious and secular establishments.  These are not the sort of facts

for which a governor and her state health officer should be held accountable for

money damages in their individual capacities.  *See King v. Pridmore*, 961 F.3d 1135,

1145 (11th Cir. 2020) ("The qualified immunity defense embodies an objective reasonableness standard, giving a government agent the benefit of the doubt, provided that the conduct was not so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed the acts."), *cert. denied sub nom. King, Trinell v. Pridmore, Ricky, et al.*, No. 20-877, 2021 WL 1520797 (U.S. Apr. 19, 2021). Indeed, this action was filed on September 24, 2020, many months after the offending April 3, 2020 order.[12]

Furthermore, from May 8, 2020 onward, the mandatory occupancy restrictions eased, bringing houses of worship on par with essential secular retailers: All were subject to capacity limits controlled by the 6-feet distancing requirement, and the 9-person occupancy restriction on religious institutions was eliminated.  The court does not discount that the 6-feet distancing rule impacted how religious sacraments, such as Baptisms, Bar/Bat Mitzvahs, and Eucharist, were conducted. But against the strictures of the May 8, 2020 order, for purposes of the qualified immunity analysis, and regardless of whether the allegations state a claim, Plaintiffs have not demonstrated that Defendants violated clearly established law as to their Free Exercise Clause challenge to the 6-feet distancing rule for houses of worship.

---

[12]   On October 6, 2020, Plaintiffs' motion for a temporary restraining order was denied, among other reasons, for "inexplicable delay."  (Doc. # 17, at 3.)

"As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law," *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614 (6th Cir. 2020), but the exceptions here are nil.  The 6-feet distancing requirement as of May 8, 2020, carried no exceptions.  It applied across the board to secular and religious gatherings alike, thus, indicating that Defendants did not selectively "impose burdens only on conduct motivated by religious belief . . . ."  *Lukumi*, 508 U.S. at 543.

Finally, Plaintiffs' contention that the guidelines for places of worship violate the Free Exercise Clause is a nonstarter.  The guidelines—which address public health concerns like disinfecting seats and improving ventilation (*see* Doc. # 1-5)— importantly are merely guidelines, not mandatory requirements.  No sanction or threat of enforcement accompanies a place of worship's disregard of the guidelines.

Accordingly, absent Plaintiffs' demonstration that Defendants violated clearly established law, Defendants are entitled to qualified immunity on Count 3.

### 3. Establishment Clause (Count 2)

In Count 2, Plaintiffs allege that Defendants' COVID-19 orders violate the Establishment Clause of the First Amendment.  Their argument focuses on the restrictions imposed on religious activities from March 27, 2020, until May 8, 2020, and the guidelines for places of worship.

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I. "This restriction has been made applicable to the states, as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1284 (11th Cir. 2014) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). Moreover, "[t]he Establishment Clause applies not only to state statutes, but [also to] acts and decisions of individual government actors . . . ." *Id*. (citing *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (alterations added)).

As a preliminary matter, the parties do not agree on what constitutional standard applies to Plaintiffs' Establishment Clause claim. Defendants analyze this claim under the test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Plaintiffs contend that the *Lemon* test does not govern and urge the court to apply *Everson v. Board of Education of Ewing Tp*., 330 U.S. 1 (1947). To be fair, the *Lemon* test "has been harshly criticized by Members of [the Supreme Court], lamented by lower court judges, and questioned by a diverse roster of scholars." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2081 (2019) (plurality) (footnotes omitted) (alteration added). In fact, the Eleventh Circuit Court of Appeals recently held that the *Lemon* test "no longer govern[s] Establishment Clause challenges to religious monuments and displays . . . ." *Kondrat'yev v. City of Pensacola*, 949 F.3d

1319, 1325 (11th Cir. 2020). However, Plaintiffs' Establishment Clause claim does not involve a challenge to religious monuments or displays, and Plaintiffs do not cite any authority indicating that *Lemon* does not control in this particular context. Accordingly, the *Lemon* test applies to Plaintiffs' Establishment Clause claim.

Under *Lemon*, the governmental action at issue survives an Establishment Clause challenge if (1) it has a secular purpose; (2) its principle or primary effect neither advances nor inhibits religion; and (3) it does not foster excessive entanglement with religion. 403 U.S. at 612–13.

Plaintiffs' Establishment Clause challenge to the guidelines for places of worship fails because the guidelines easily pass muster under *Lemon*. The guidelines plainly have a strong secular purpose—slowing the spread of COVID-19. Moreover, their principal or primary effect neither advances nor inhibits religion because they are permissive suggestions, not binding requirements. And given their permissive nature, it cannot be said that the guidelines foster an excessive entanglement with religion.

While the guidelines withstand scrutiny under *Lemon*, the restrictions imposed on religious activities from March 27, 2020, until May 8, 2020, are problematic. True, the restrictions, like the guidelines, had a secular purpose (*i.e.*, mitigating the transmission of COVID-19). But the real issue is whether the principal or primary effect of the restrictions *inhibited* religion. As previously

detailed in the free exercise section, *see supra*, at 46–50, the April 3, 2020 order treated gatherings at houses of worship differently from gatherings at big box retailers, allowing less at the former and more at the latter with no apparent justification.  This is a problem in the context of the Establishment Clause because "[t]he First Amendment mandates governmental neutrality between . . . religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (alteration added). The March 27 order also inhibited religious activities:  It instituted a hard cap on attendance at religious services to no more than 9 people contingent upon social distancing requirements and, unlike subsequent orders, did not contain an express exception for drive-in religious events.  Given that the March 27 and April 3 orders inhibited religion, they likely fostered an excessive entanglement between church and state. *See Agostini v. Felton*, 521 U.S. 203, 232 (1997) (explaining that "the factors we use to assess whether an entanglement is 'excessive' are similar to factors we use to examine 'effect'").

Nevertheless, it need not be decided whether the allegations plausibly state an Establishment Clause violation because, for the reasons previously discussed in the free exercise section, *see supra*, at 46–50, Defendants' March 27 and April 3 orders did not violate clearly established law, and the restrictions in the orders have since abated.  Put differently, even if Defendants' conduct in enacting the orders at issue violated the Establishment Clause, their actions cannot be viewed in a vacuum for

purposes of qualified immunity.  When Defendants issued the March 27 and April 3 orders, they were acting during the early days of a pandemic not seen in more than a century and did not have the benefit of any clearly established law indicating that their orders violated the Establishment Clause in such a context.   Accordingly, Defendants are entitled to qualified immunity on Count 2.

### 4.  Freedom of Assembly:  Expressive Association (Count 4)

In Count 4, Plaintiffs allege that Defendants' COVID-19 orders restricted their right to assemble.  Plaintiffs take aim at the March 27, 2020 order, which provided that "all non-work related gatherings of 10 persons or more, or non-work related gatherings of any size that cannot maintain a consistent six-foot distance between persons are prohibited."  (Doc. # 40-1, at 18–19.)  Specifically, Plaintiffs allege that "Defendants [sic] actions have violated [their] constitutional rights to assemble in congregational worship in a manner which their faith requires . . . ." (Doc. # 40, at 21.)  Because Plaintiffs' allegations implicate their right to associate for the purpose of religious worship, the court construes Count 4 as an expressive association claim arising under the First Amendment.  *See Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1157 (D. N.M. 2020) (construing a freedom of assembly claim as an expressive association claim because the plaintiff asserted "its right to associate for the purpose of engaging in religious exercise").

"The First Amendment protects two forms of association: expressive association and intimate association." *Gaines v. Wardynski*, 871 F.3d 1203, 1212 (11th Cir. 2017).   As relevant here, "[t]he right of expressive association—the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as . . . the exercise of religion—is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms." *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994).   Yet, "[t]he right to associate for expressive purposes is not . . . absolute." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).   "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id*. (citations omitted).

Here, the March 27, 2020 order serves a compelling state interest—preventing the spread of the COVID-19 virus. *See Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 67 (slowing "the spread of COVID-19 is unquestionably a compelling interest").   That said, Plaintiffs' allegations do suggest that Defendants' March 27 order impermissibly chilled their expressive association right to gather for the purposes of religious worship.   As previously explained, the order capped attendance at religious services to no more than 9 socially distanced people and did not contain an express exception for drive-in religious events.   These aspects of the March 27

55

order provide support for the proposition that Defendants did not advance their compelling interest in protecting the public's health through the least restrictive means of achieving those ends. *See id*. (explaining that "the maximum attendance at a religious service could be tied to the size of the church or synagogue").

Again, though it appears that the allegations plausibly state a violation of Plaintiffs' constitutional right to expressive association, for the reasons previously discussed in the free exercise and establishment clause sections, *see supra*, at 46–50, 53–54, Defendants' March 27 order did not violate clearly established law, and its restrictions have since abated. Accordingly, Defendants are entitled to qualified immunity on Count 4.

### 5. *Substantive Due Process (Count 5)*

In Count 5, Plaintiffs Farr, Ervin, and Case all allege that Defendants' actions violated their substantive due process rights. Starting with Farr and Ervin, their substantive due process claim is based on the theory that Defendants' actions infringed upon their economic liberties. Specifically, Farr and Ervin contend that they "have been denied their right to work and make a living for themselves and their families as a result of the Defendants' action in closing their business." (Doc. # 40, at 21.) Their claim is without merit.

The United States Supreme Court has held "for many years . . . that the 'liberties' protected by substantive due process *do not* include economic liberties."

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010) (citing *Lincoln Fed. Labor Union v. Nw. Iron & Metal Co.*, 335 U.S. 525, 536 (1949) (emphasis added)).  And the Eleventh Circuit, albeit in an unpublished opinion, noted that "the right to work in a specific profession is not a fundamental right." *Helm v. Liem*, 523 F. App'x 643, 645 (11th Cir. 2013).  Hence, Defendants' orders that closed Farr's and Ervin's business are subject to rational basis review. *See Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1430 n.5 (11th Cir. 1998) (explaining that "because the regulation about which Plaintiffs complain is economic, the legislation is presumed valid unless no rational basis exists for its enactment").  The orders pass that test:  Preventing the spread of COVID-19 is a legitimate government interest and the measures at issue are rationally related to serving that interest.

Other courts addressing similar economic substantive due process challenges to business closures during the COVID-19 pandemic have reached the same outcome.  *See*, *e.g.*, *Savage v. Mills*, 478 F. Supp. 3d 16, 30 (D. Me. 2020) (dismissing the plaintiffs' economic substantive due process claim because "[h]arm to business interests . . . is not a 'plain, palpable invasion of rights' under the Fourteenth Amendment"); *Paradise Concepts, Inc. v. Wolf*, 482 F. Supp. 3d 365, 371–72 (concluding that the plaintiffs' "claims concerning the right to operate a business are not actionable in a Substantive Due Process Claim"); *Best Supplement*

*Guide, LLC v. Newsom*, No. 2:20-cv-965-JAM-CKD, 2020 WL 2615022, at *6 (E.D. Cal. May 22, 2020) (finding that the plaintiffs did not have a substantial likelihood of success concerning their substantive due process claim because the right to pursue work was not fundamental and the state's orders were enacted for a legitimate reason).

Case's substantive due process claim is different. She argues that Defendants' mask requirement unconstitutionally infringed on her substantive due process right to control the upbringing of her children. To this end, she alleges that "causing her children to wear a mask violates her beliefs as a mother and parent of 2 children." (Doc. # 40, at 22.)

While it is true that the Supreme Court has long recognized that a fundamental right exists "to direct the education and upbringing of one's children," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)), the court is skeptical that such a right is broad enough in scope to encompass an interest in keeping one's children from wearing a mask during a global pandemic, *see Reno v. Flores*, 507 U.S. 292, 302 (1993) (explaining that any "substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field") (cleaned up).

Still, any doubt about whether the mask requirement implicated (or infringed) Case's fundamental right to direct the upbringing of her children is dismissed because her substantive due process claim fails for a separate reason: The complaint's allegations do not plausibly demonstrate that Defendants' conduct in enacting the mask requirement rose to the "conscience-shocking level." *Davis*, 555 F.3d at 982; *see also Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 226 (N.D. N.Y. 2020) (finding that the defendant's COVID-19 orders, which closed overnight summer camps, did not rise to the conscience-shocking level necessary to establish a substantive due process claim concerning the right to control the upbringing of one's children).

Consequently, Defendants are entitled to qualified immunity on Count 5 because Farr, Ervin, and Case fail to plausibly allege a violation of their substantive due process rights.

### 6. Per Se Regulatory Taking (Count 6)

In Count 6, Plaintiffs Ervin and Farr allege that the March 27, 2020 order, which directed non-essential businesses, including Ervin's and Farr's barber shop, to close to non-employees or not take place, shuttered the doors of their business. Ervin and Farr further allege that the order deprived them of "virtually all economically viable use of their" business for a temporary period. (Doc. # 40, at 23.) Based on these allegations, Ervin and Farr argue that the order amounted "to a

*per se* compensable taking under the rule established in *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)."  (Doc. # 49, at 19–20.)  Their argument is unavailing.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend V.  "[T]o state a Takings claim under . . . federal . . . law, a plaintiff must first demonstrate that he possesses a property interest that is constitutionally protected." *Givens v. Ala. Dep't of Corr.*, 381 F.3d 1064, 1066 (11th Cir. 2004) (cleaned up). "Only if the plaintiff actually possesses such an interest will a reviewing court then determine whether the deprivation or reduction of that interest constitutes a taking." *Id.*  (citation and internal quotation marks omitted).

Assuming, without deciding, that Ervin and Farr have alleged a constitutionally protected property interest in operating their business, their *per se* regulatory takings claim fails because the closure of their business did not permanently deprive their property of all value.  A *per se* regulatory taking occurs "where regulation denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015.  The Supreme Court, however, has clarified "that the categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation *permanently deprives property of all value* . . . ."  *Tahoe-Sierra Pres.*

*Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 332 (2002) (emphasis added).

Here, Defendants' March 27 order resulted in a temporary closure of Ervin's and Farr's business—forty-four days to be exact. This "temporary prohibition on economic use" did not render Ervin's and Farr's interest in operating their business "valueless" because the interest "recover[ed] value as soon as the prohibition [was] lifted" on May 11. *Id*. (alterations added). Moreover, the forty-four-day closure of Ervin's and Farr's business is nowhere near the thirty-two-month prohibition at issue in *Tahoe-Sierra*, which still fell short of constituting a *per se* regulatory taking. Thus, the allegations in the complaint do not present an "extraordinary case in which a regulation permanently" deprived Ervin and Farr of all value associated with their business. *Id*.[13]

---

[13]  While neither party addresses the issue, Ervin's and Farr's *per se* regulatory takings claim also fails under the framework set out in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). Under that framework, courts analyze three factors to determine whether the regulation at issue constitutes a taking: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action. *Id*. at 124. Here, the first two factors weigh in favor of Ervin and Farr. The temporary closure of their business undoubtedly caused a negative economic impact and interfered with investment-backed expectations. However, the third factor—the character of the government action—cuts in favor of Defendants and outweighs the other two factors. *See TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 839 (W.D. Tenn. 2020) ("The character of Defendants' actions and the context in which Defendants find themselves, here facing a national public health emergency, cut strongly against a finding that the COVID-19 Closure Orders amount to regulatory takings.").

Ervin's and Farr's takings claim fails for another independent reason—the March 27 order represents a valid exercise of Alabama's police power.  The plain language of the Takings Clause does not require compensation unless private property has been taken "for public use."  U.S. Const. amend. V.  And there is no taking for "public use" when the government acts pursuant to its police power.  *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491 (1987) ("Long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community[,] . . . and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.") (cleaned up); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 592 (1962) ("If this ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional."); *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887) ("A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health . . . or safety of the community, cannot, in any just sense, be deemed a taking . . . for the public benefit.").  Thus, pursuant to Alabama's police power, Defendants "reasonably concluded that the health, safety . . . or general welfare would be promoted by" ordering the temporary closure of Ervin's and Farr's business.  *Penn Central*, 438 U.S. at 125; *see also TJM 64, Inc.*, 475 F. Supp. 3d at

339 ("Defendants' promulgation of the . . . COVID-19 Closure order was not for a 'public use' but was instead a valid exercise of the broad police powers bestowed upon state and local officials to prevent detrimental public harms by restricting Plaintiffs' use of their property.").

Therefore, Defendants are entitled to qualified immunity on Count 6 because Farr and Ervin fail to plausibly allege a *per se* regulatory takings claim.

### 7. *Contracts Clause (Count 7)*

The Contracts Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const., Art. I, § 10, cl. 1.  "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"  *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 410 (1983) (citation omitted).  When evaluating a Contracts Clause claim, courts examine three factors:  "(1) whether the law substantially impairs a contractual relationship; (2) whether there is a significant and legitimate public purpose for the law; and (3) whether the adjustments of rights and responsibilities of the contracting parties are based upon reasonable conditions and are of an appropriate nature."  *Vesta Fire Ins. Corp.*, 141 F.3d at 1433.  All three factors weigh in favor of Defendants.

First, Plaintiffs fail to plausibly allege a *substantial* impairment of a contractual relationship. The only argument that Ervin and Farr advance concerning this factor is that "contracts with their employees were severely impaired during the period that Defendants' orders completely shut down their business." (Doc. # 49, at 20.) However, Defendants' orders directing Ervin's and Farr's business to temporarily close did not result in a "severe, permanent," or "irrevocabl[e]" change in the contractual relationships with their employees. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978) (citation omitted). Rather, such orders amounted to a "temporary alteration" of those contractual relationships. *Id.*; *see also Xponential Fitness v. Arizona*, No. CV-20-01310-PHX-DJH, 2020 WL 3971908, at *9 (D. Ariz. July 14, 2020) ("As the closure of gyms pursuant to the [COVID-19 order] is temporary, the Court is skeptical that it meets the threshold requirement of substantial impairment.").

Second, there can be no dispute that a significant and legitimate public purpose existed for the temporary closure of Ervin's and Farr's business: Protecting the public health by slowing the spread of COVID-19 at close-contact service providers. *See Xponential Fitness*, 2020 WL 3971908, at *9 (finding that COVID-19 business closure order "was a reasonable way to advance a legitimate public purpose—namely, slowing the spread of COVID-19 in Arizona").

64

Third, the adjustments of rights and responsibilities of the contracting parties were based upon reasonable conditions and were of an appropriate nature. Concerning this factor, "[u]nless the State itself is a contracting party . . . courts properly defer to legislative judgement as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 412–13 (cleaned up). Here, the contracts at issue were between private parties; the State of Alabama was not a party. Thus, based upon Defendants' judgment in the face of the COVID-19 emergency, the temporary business closures' impact on Ervin's and Farr's employment contracts did not amount to an unconstitutional impairment.

Accordingly, Defendants are entitled to qualified immunity on Count 7 because Plaintiffs fail to plausibly allege a Contracts Clause violation.

## VI. CONCLUSION

Defendants instituted drastic measures to curtail the drastic impact of COVID-19 on the citizens of Alabama. But as Chief Justice Roberts recently explained, the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). And "[w]hen those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their

latitude 'must be especially broad.'" *Id*. (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974) (first alteration added)).

The court is not unsympathetic to Plaintiffs' plight in general and especially in relation to the sacred, fundamental constitutional rights held dear by most Americans. But there is not one citizen living within the borders of this land who has not suffered real, sometimes harsh, effects from governmental reactions (at all levels) to the COVID-19 crisis. The political, medical, scientific, and legal conclusions that resulted are a legitimate product of our constitutional republic when those representatives declare a national emergency. The legal conclusions herein reflect this court's finding that the facts of the case do not rise, after applying existing law to all these circumstances, to a level justifying judicial intervention.

Because Defendants acted within their broad latitude to address the multitude "medical and scientific uncertainties" brought on by the COVID-19 pandemic, their actions "should not be subject to second guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id*. at 1614 (citing *Garcia v. San Antonio Metro. Transit Auth*., 469 U.S. 528, 545 (1985)).

Accordingly, it is ORDERED that Defendants' motion to dismiss (Doc. # 42) is GRANTED as follows:

(1)     Defendants' motion to dismiss is granted as to Plaintiffs' claim for retrospective injunctive relief for lack of standing.

(2)     Defendants' motion to dismiss is granted as to Porter's takings clause claim (Count 6) and contracts clause claim (Count 7) for lack of standing.

(3)     Defendants' motion to dismiss is granted as to Plaintiffs' claim for prospective injunctive relief because such claim is moot.

(4)     Defendants are entitled to Eleventh Amendment immunity against Plaintiffs' claims for money damages against them in their official capacities, and those claims for money damages are dismissed with prejudice.

(5)     Defendants are also entitled to Eleventh Amendment immunity against Plaintiffs' *ultra vires* claim (Count 8), and this claim is dismissed with prejudice.

(6)     Defendants are entitled to qualified immunity on Plaintiffs' establishment clause claim (Count 2), free exercise claim (Count 3), and expressive association claim (Count 4) because the complaint's allegations do not plausibly establish that Defendants' conduct violated clearly established law.  These claims are dismissed with prejudice.

(7)     Defendants are also entitled to qualified immunity on Plaintiffs' void for vagueness claim (Count 1), substantive due process claim (Count 5), takings clause claim (Count 6), and contracts clause claim (Count 7) because the complaint's

allegations do not plausibly establish that Defendants' actions violated Plaintiffs' constitutional rights.  These claims are dismissed with prejudice.

It is further ORDERED that Plaintiffs' motion for preliminary injunction (Doc. # 2) is DENIED as moot, and that this case is DISMISSED.

DONE this 1st day of June, 2021.

/s/ W. Keith Watkins
_____
UNITED STATES DISTRICT JUDGE
